(No. 24511.—

LAURA SHLENSKY, Appellant, *vs.* JOHN SHLENSKY, Appellee.

*Opinion filed June 15, 1938.*

Joseph P. Hector, for appellant.

Abraham M. London, and Jacob Levy, (Edward Mc-Tiernan, of counsel,) for appellee.

Mr. Justice Stone delivered the opinion of the court:

This cause is here for review of a decree of the superior court of Cook county entered in a divorce proceeding. The appeal was apparently taken from the entire decree but the briefs of the parties show that only that part of the decree relating to the disposition of real estate is questioned. No objections are urged here to any other portion of the decree. The cause comes here on direct appeal, a freehold being involved.

Appellant filed a complaint against appellee seeking a divorce on the ground of cruelty and praying, also, for solicitor's fees and the custody of their minor child. The appellee answered denying the charges of the bill and filed a counter-claim seeking a divorce on the ground of adultery and likewise seeking the custody of their minor child. The counter-claim also prayed that a certain deed and trust agreement entered into between the parties be set aside and that the trustee therein named be decreed to reconvey the premises to the parties in joint tenancy as they had originally been held. The cross-complaint also sought an accounting of rents collected since December 13, 1930. The application for divorce in the cross-complaint was later withdrawn and the cause was heard on the original complaint of appellant for divorce and the cross-complaint of the appellee seeking to set aside the transfer of the property. On hear-

ing, the chancellor entered a decree granting appellant a divorce and the custody of the minor child. Further, and in accordance with the prayer of the cross-complaint of appellee, the decree set aside the transfer of the real estate in trust.

The decree found, and the undisputed facts are, that on September 30, 1922, the parties purchased the property involved in this case, consisting of a two-apartment house and a two-car garage for $3500, $2500 of which was paid in cash from earnings of both appellant and appellee, and a mortgage for $1000 was placed upon the property and subsequently paid in like manner. The title to the property was taken in the names of appellant and appellee as joint tenants. On April 14, 1930, appellant filed a bill for divorce which was voluntarily dismissed on May 14, following. Again, on September 7, 1930, she filed another suit for divorce. Appellee filed an answer and the cause was dismissed for want of prosecution on August 30, 1934.

On the controverted issues of fact the decree finds that on December 20, 1930, the appellant's attorney called at the home of appellant when appellee was also present, and represented to the latter that the appellant had decided to dismiss her pending divorce proceeding but that in order to do so it would be necessary for appellee to sign papers which the attorney produced, and that, relying upon such representations, appellee signed the papers, but, instead of being an agreement for dismissal of the divorce suit, the documents were, in fact, a quitclaim deed and a trust agreement conveying the premises in question to the Central Manufacturing District Bank, as trustee, under trust No. 405, for the sole and exclusive benefit of the appellant. These instruments were later recorded. The Chicago City Bank and Trust Company later became successor in trust.

The chancellor finds that appellant and her attorney induced the appellee to execute the quitclaim deed and that appellee did not know, and was not aware until long after,

that he was divesting himself of his interest in the real estate. The decree also finds that the parties lived in the premises for six years thereafter and that appellee paid the real estate and water taxes and did not leave the premises until about December 10, 1936. A confidential relationship is found by the chancellor to have existed between the parties of which the appellant took advantage because of appellee's ignorance and illiteracy, and that the execution of the deed and trust agreement was procured by fraudulent representations and was not the voluntary act of the appellee. The decree granted the divorce to appellant as hereinbefore stated, fixed the payment of alimony in the sum of $3 per week for the care of the daughter, canceled the trust deed as a cloud on the title of appellee and ordered appellant to pay appellee, within thirty days, the sum of $1500 for his interest in the property, on failure of which appellee was empowered to take over the right of appellant for $2000.

This court has many times announced that it will not disturb the findings of fact of the chancellor who heard and saw the witnesses unless such findings are manifestly against the evidence. (*Floberg* v. *Floberg*, 358 Ill. 626.) If they are, it becomes the duty of this court to set aside such findings.

The principal question in the case is whether the deed of the appellee was voluntary or made under duress or misapprehension, as he, in his brief and by his testimony, claims. The parties were born in Europe. Appellant is able to read and write in the English language. The appellee testified he was unable to read or write English. In this he is contradicted by the appellant and one other witness, both of whom testified that he could read and write English. He does not deny that he signed the instruments sought to be set aside. It is not denied that the premises were purchased in joint tenancy, nor is it denied that the documents, whatever appellee thought them to be, were

signed in consideration of the dismissal of appellant's second suit against him for divorce, which was dismissed for want of prosecution on August 30, 1934.

Appellee testified that he signed the deed under duress; that he had refused to sign and appellant's lawyer seized him by the neck and forced him to sign; that he was unable to read and write English and that he was told the papers he was signing were an agreement to dismiss appellant's divorce suit. He testified that Joseph P. Hector, appellant's lawyer, came to their home about 9:00 o'clock on the evening of December 12; that he did not know Hector was coming; that no one read the documents to him and he did not know he was signing away the property. He stated that he had a lawyer, a Mr. McGilvray, and that both appellant and her lawyer knew that fact but did not inform McGilvray of the meeting to sign the papers. He testified that both Hector and the appellant told him the papers were merely for the dismissal of the divorce suit. He also testified that after he had signed the papers he went to see his lawyer, McGilvray. The latter, who was not representing him on the trial of this cause, was placed on the stand by appellant's counsel and denied that he had ever had any conversation with appellee concerning the signing of the papers, but testified that he knew, as appellee's attorney at the time, that negotiations were on between the parties and knew of a deed to the house being signed; that appellee wanted to come back and live with appellant and that the witness and counsel for appellant made the arrangements, but the witness had nothing to do with the preparation of the papers or the execution of them.

Appellant testified that appellee wanted to make her a deed of his interest as a consideration for coming back to live with her, and that the two went to the office of her attorney, Hector, and asked him to make out the deed; that he said he was unable to do so that day, but, as he had some business in their neighborhood he would bring the deed to

their home the next day. She testified that Hector explained the trust deed to them and that her husband agreed the property should be held in trust for her benefit; that on the evening when her counsel came to their house he remained there about a half hour; that he read the deed aloud and handed it to the appellee who read it and signed it and handed it to appellant and she signed it, and their acknowledgment was taken by the lawyer. She testified there was no argument between Hector and the appellee and the former did not force appellee to sign the instrument. She testified, also, that during the time the transaction took place there were four witnesses present, a Mrs. Zibutis, Mr. and Mrs. Dominick Motuzas and Stella Shlensky. She testified, also, that appellee told her to take the papers to the bank; that he did not want to lose time to take them, and that she did so.

Stella Shlensky, the daughter of the parties, testified she was present at the signing of the quitclaim deed and trust agreement and substantiated the statements of her mother concerning the events of the evening. She testified that her father said to her "Mr. Hector is coming and is going to come with a deed;" that there was no fight among any persons that evening; that Hector did not grab her father by the back of the neck and say "Sign this deed;" that, on leaving, Hector told her father and mother to go to the bank the next day and that the papers were handed to her father who told her mother to take them to the bank.

Dominick Motuzas, a witness to the signing of the deed and trust agreement, testified that Laura and John Shlensky sent for him to come over to their house before Hector arrived; that he and his wife came over; that they were eating dinner when Hector appeared; that the door from the kitchen to the front room was open and he heard Hector read the deed; that Hector called him into the front room and he saw Laura and John sign; that Hector did not force appellee to sign and there were no words between any per-

sons in the house. Upon leaving, Hector shook hands with appellant and appellee and said "Goodnight."

Amelia Motuzas, wife of Dominick, testified through an interpreter and corroborated his testimony as to their presence on the evening of the signing of the deed and trust agreement. She testified that she heard Hector read papers, and that appellee was not forced to sign. She also testified that three days before the papers were signed appellee came to appellant's house and begged her to go with him to sign a deed to the house, so they could live together again; that they went out and on their return told the witness that they had been too late and the lawyer couldn't make out the deed that day. She also testified that she and her husband lived in the first floor of the Shlensky's flat building; that appellee had read letters for her which she had received and had translated them into Lithuanian.

Attorney Joseph P. Hector also testified concerning the execution of the documents to the effect that they were voluntarily signed; that he did nothing to force appellee to sign, and had not deceived appellee as to their contents.

Counsel for appellee raise a question as to the propriety of Hector's testifying. This court has not infrequently stated that counsel in the case should not testify, and that, while he had a right to do so under the law, courts give little credence to such testimony. On the other hand, it is argued by Hector that his integrity was impeached by the testimony of appellee that he seized him by the neck and forced him to sign these papers and that he felt he should have a right to defend himself. While such fact constitutes an extenuation, yet three witnesses denied the testimony of appellee, and it should not have been necessary for him to take the stand in his own defense. He argues that he thought it was necessary and the decree and finding of the chancellor seem to bear him out in that regard.

No one but the appellee testified that he was misled, or was in any way forced to sign. All other witnesses stated

that the deed was read aloud before he signed and that all parties were on friendly terms and that he was not forced to sign. There is no testimony in the record other than that of the appellee that he was unable to read and write English or that he was deceived as to the contents of the instruments. On the other hand, there is substantial testimony and contradiction concerning his ability to read and write English.

Duress has been defined as a condition which exists where one is induced by an unlawful act of another to make a contract or perform or forego an act under circumstances which deprive him of the exercise of his free will. There must be such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker. Such compulsion must be present and operate at the time the instrument is executed. (*Decker* v. *Decker,* 324 Ill. 457; *Harris* v. *Flack,* 289 id. 222.) The burden of proving such duress, or that appellee was induced by fraudulent representations to sign the quitclaim deed and trust agreement, was upon appellee. He is entirely without substantiation of his testimony in this record and is contradicted by four witnesses in all the details of his testimony concerning the transaction. Moreover, he thereafter resided with appellant for six years, until in 1936, when she filed the complaint in this case. To set aside a deed to real estate on the ground of fraud, the evidence must be clear and convincing. (*Burandt* v. *Burandt,* 318 Ill. 218; *Sirois* v. *Sirois,* 308 id. 453.) It is a familiar rule, as was said by this court in *Hagan* v. *Waldo,* 168 Ill. 646, that a deed duly executed and delivered cannot be impeached by the subsequent declarations of the grantor. Appellee's testimony, alone, is not sufficient ground for setting aside the deed.

A review of the entire record convinces us that appellee has not sustained the burden placed upon him and clearly discloses that the findings of the chancellor are contrary to

the manifest weight of the evidence. Nor does the record show a fiduciary relationship existing between these parties as found by the chancellor. They were in disagreement. She had filed a bill for divorce. They were not living together. Each had employed counsel in an action against the other. It is difficult to perceive the existence of a confidential or fiduciary relationship under such circumstances. While it is claimed that the wife had superior education, what education she had beyond ability to read and write English does not appear, and, as we have shown, three witnesses testified that the appellee could read and write English.

There is a direct dispute as to who paid the taxes during the six years in which the parties lived together. Appellee testified he paid them and appellant testified she did. Anna Poleikis testified that in February or March, 1935, appellant gave her $37 or $38 and requested her to pay the taxes for appellant and that she took them to the county building and paid the taxes. Joseph Poleikis testified he did cleaning and painting in the building, repairing pipes, and on one occasion put in a new heater, and that appellant paid him for these services. It is not disputed that appellant was employed during most of her married life and it is apparent that she was not dependent on appellee for the payment of taxes and cost of the up-keep of the building.

Appellee further argues that while appellant has attacked the decree only in so far as it set aside the conveyance of the real estate, the notice of appeal filed by her counsel shows an appeal to have been taken from the entire decree and that, as she had accepted part of the benefits of the decree, she must be held to have released errors. The rules of this court provide that the notice of appeal shall specify and describe the order, determination, decision, judgment or decree which is being appealed from, and if the appeal is from a part, only, it shall be specified which part. While an acceptance of part of the benefits of the decree may, under certain circumstances, be raised as release of errors,

such release of errors must be pleaded in order to entitle such question to the consideration of the court. Appellee raised no such point by plea but joined in error and filed briefs.

We are convinced that the finding of the chancellor concerning the signing of the deed and trust agreement was wrong and that the court erred in setting those instruments aside. The decree granting the prayer of the original complaint is correct and is affirmed; in so far as it granted the prayer of the cross-complaint to set aside the deed and trust agreement, it is reversed.

*Affirmed in part and reversed in part.*